USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 6/11/2021

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------X
GENERAL ELECTRIC COMPANY,                    :
                                             :
        Plaintiff/Counterclaim Defendant,    :
                                             :
        - against -                          :
                                             :
APR ENERGY PLC,                              :   19 Civ. 3472(VM)
                                             :
        Defendant/Counterclaim Plaintiff,    :   **DECISION AND ORDER**
                                             :
APR ENERGY HOLDINGS LIMITED,                 :
POWER RENTAL OP CO AUSTRALIA LLC,            :
AND POWER RENTAL ASSET CO TWO LLC,           :
                                             :
        Third-Party Plaintiffs,              :
                                             :
        - against –                          :
                                             :
GENERAL ELECTRIC COMPANY,                    :
                                             :
        Third-Party Defendant.               :
-----------------------------------------X

**VICTOR MARRERO, United States District Judge.**

On April 18, 2019, plaintiff General Electric Company ("GE") commenced this action against defendant APR Energy plc[1] ("APR Energy"), bringing one count of breach of contract ("Count One") stemming from APR Energy's refusal to pay certain fees allegedly owed under the parties' October 28, 2013 Master Supply Agreement ("MSA"). (See "Complaint," Dkt. No. 1.) On May 28, 2019, APR Energy answered the Complaint and, together with APR Energy Holdings Limited, Power Rental OpCo Australia LLC, and Power Rental Asset Co Two LLC

--------
[1] This entity is now known as APR Energy Limited.

(collectively, "APR") asserted two counterclaims: one count of breach of contract ("Counterclaim One") stemming from GE's alleged failure to provide unencumbered title to four turbines it sold APR, in violation of the parties' October 22, 2013 Business Transfer Agreement ("BTA"); and one count of breach of warranty ("Counterclaim Two") stemming from GE's sale of fifteen allegedly defective turbines, in breach of the MSA. (See "Answer & Counterclaims," Dkt. No. 22.)

Now pending before the Court are the parties' cross motions for summary judgment. GE filed its motion for summary judgment on all pending claims and counterclaims. (See Dkt. No. 129). APR filed a motion for partial summary judgment on GE's breach-of-contract claim and APR's breach-of-contract counterclaim, and for a declaratory judgment providing that GE's liability for breaching the MSA is not capped. (See Dkt. No. 131.) For the reasons set forth below, GE's motion is GRANTED with respect to Count One and DENIED as to Counterclaims One and Two, and APR's motion is DENIED in its entirety.

## I. BACKGROUND

### A. FACTUAL BACKGROUND[2]

---

[2] Except as otherwise noted, the following background derives from the undisputed facts as set forth by the parties in their Local Rule 56.1 Statements of Undisputed Material Facts and responses thereto. (See "GE's Stmt.," Dkt. No. 142; "APR's Stmt.," Dkt. No. 126; "GE's Opp'n Stmt.," Dkt. No. 145; "APR's Opp'n Stmt.," Dkt. No. 152;

GE is a New York corporation headquartered in Boston. When the parties began doing business together, and as relevant here, GE delivered, leased, and maintained various types of power plant equipment. This business (the "Energy Rentals Business") included renting gas-turbine-powered generators.

The entities that comprise APR are all headquartered in Jacksonville, Florida. Some are registered in England and Wales, while others are Delaware limited liability companies. Together, APR provides power-generation solutions internationally in cases of emergency or natural disasters.

In early 2013, the parties began negotiating the transaction that would ultimately form the basis of the present dispute. Initially, they contemplated GE acquiring APR, but eventually agreed to a transaction in which APR would instead purchase GE's Energy Rentals Business. Throughout the negotiations, both parties were represented by counsel, who

---

"GE's Reply Stmt." Dkt. No. 168.) The Court has also considered the full record submitted by the parties, including the following frequently cited exhibits: the MSA, Dkt. No. 136-1; the BTA, Dkt. No. 136-21; the "Waiver Letter," Dkt. No. 135-18; the "October 26, 2015 Letter," Dkt. No. 154-15. No further citations to the record will be made herein except when specifically quoted. The Court construes any disputed facts discussed in this section and the justifiable factual inferences arising therefrom in the light most favorable to the nonmovant for each motion, as required under the standard set forth in Section II.A. below.

assisted them in conducting due diligence and negotiating the terms.[3]

The sale closed on October 28, 2013. In exchange for the Energy Rentals Business, APR paid GE a combination of $64 million in cash and $250 million in APR shares. The transaction was structured this way in view of the parties' intent to continue working together after the sale as, by purchasing shares of APR, GE would theoretically maintain an interest in APR's success.

The parties signed a number of agreements throughout the course of negotiating and executing the sale. Two contracts in particular are relevant to the claims and counterclaims at issue here: the BTA and the MSA.

    1.   The BTA

GE and APR Energy heavily negotiated the BTA and exchanged at least ten drafts before executing the final version on October 22, 2013. The BTA sets forth the terms by which GE would sell to APR Energy the business of "large-scale, long-term temporary power generation rental through the use of mobile aero-derivative turbines," or the Energy Rentals Business, as previously defined herein. (See BTA at 1.) Under the procedure established in the BTA, GE would first

_____

[3] In the lead up to closing, the parties also executed a term sheet on August 30, 2013, and APR issued a prospectus on October 24, 2013.

ensure that certain GE companies, the "Sellers,"[4] held all shares or ownership interests in the "GE Entities."[5] Then, the Sellers would transfer the Energy Rentals Business to the GE Entities, "pursuant to and subject to the terms of the Contribution, Assignment and Assumption Agreements." (Id.) GE would in turn "cause the Sellers to sell to [APR Energy]" the Energy Rentals Business, "consisting of all of the issued and outstanding shares and membership interests of the GE Entities." (Id.)

APR alleges that GE breached Section 3.08 of the BTA.[6] Section 3.08, titled "Ownership of Equipment Assets," provides:

> The Equipment Assets are owned by the Sellers and, as of the Closing Date, the GE Entities will have *good title* to the Equipment Assets, in each case *free and clear of all Liens* except for Permitted Liens or Liens created by or through the Buyer or any of its Affiliates.

(BTA § 3.08 (emphasis added).) The BTA in turn defines "Equipment Assets" as "the turbines, associated packages, parts and other assets listed on Schedule A to the Form of

---

[4] The BTA defines the "Sellers" as GE Rental Asset Holding, Inc., General Electric International, Inc., and General Electric Canada. (See BTA at 1.)

[5] The BTA defines "GE Entities" as Power Rental Op Co Bangladesh Limited, Power Rental Op Co Canada ULC, Power Rental Op Co One LLC, Power Rental Op Co Australia LLC, Power Rental Asset Co One LLC, and Power Rental Asset Co Two LLC. (Id.)

[6] Initially, APR also alleged that GE breached Section 5.01 of the BTA which provides that GE "will . . . conduct the Business in the ordinary course of business." (BTA § 5.01.) However, because APR has withdrawn its claim for breach of this provision, the Court need not address it. See infra note 16.

Contribution, Assignment and Assumption Agreement." (BTA, Ex. A at GEAPR_00000213; see also id. Ex. C (the "Form Contribution Agreement") at GEAPR_00000249.)

A footnote to Schedule A explains that it is "to be revised upon execution of each Contribution, Assignment and Assumption Agreement to include the applicable Equipment Assets assigned by the applicable Transferor to the applicable Transferee" and that "[a]ll Equipment Assets will be assigned in accordance with the Agreement." (BTA, Schedule A at GEAPR_00000255.)

As relevant here, on October 27, 2013, General Electric International, Inc. ("GE International") and Power Rental Asset Co Two LLC ("Asset Co") signed a Contribution, Assignment and Assumption Agreement. (See Falk Decl. Ex. 25 (the "Asset Co Contribution Agreement"), Dkt. No. 136-25.) Neither GE nor APR is a signatory to the Asset Co Contribution Agreement. But, General Electric International, Inc. is a subsidiary of GE and one of the "Sellers" as defined in the BTA, and Asset Co was acquired by APR.

Several other sections of the BTA -- regarding amendments, indemnification obligations, and survival of claims -- bear on the parties' dispute. First, Section 11.09 provides that: "[n]o provision of this Agreement or any Ancillary Agreement may be amended or modified except by a

written instrument signed by all the parties to such agreement." (BTA § 11.09.)

Second, with respect to indemnification, Section 9.01(a)(1) provides: "GE Parent[7] and the Sellers shall indemnify [APR Energy and its Affiliates] . . . for . . . the inaccuracy or breach of any representations or warranties made by GE Parent in this Agreement." (Id. § 9.01(a)(1).) However, before any indemnification might be owed, upon the possibility of loss arising, the parties each agreed "to take all reasonable steps to mitigate their respective Losses." (Id. § 9.05.) Any indemnification ultimately owed under Section 9.01 "will be paid by tender of the [APR Energy] Shares."[8] (Id. § 9.07.) And, under Section 9.01(b)(ii), "the cumulative indemnification obligation of the Sellers under Section 9.01(a)(i) . . . shall in no event exceed $5,000,000."[9] (Id. § 9.01(b)(ii).)

The BTA provides that these warranties "survive in full force and effect until the date that is twenty-four months

_____

[7] The BTA defines "GE Parent" as GE. (BTA at 1.)
[8] GE no longer owns any APR shares.
[9] The parties later entered into a resolution agreement (the "Resolution Agreement") on March 28, 2014, under which GE paid a $2.5 million credit to APR to resolve certain claims APR had under the BTA. Under the Resolution Agreement, that $2.5 million was to be applied against the $5 million indemnification cap provided in Section 9.01(b) of the BTA. (See Falk Decl. Ex. 26, Dkt. No. 137-17, at APR00063901.)

after the Closing Date, at which time they shall terminate."[10]
(BTA § 11.01.) That provision further makes clear that "no
claims shall be made for indemnification under Sections
9.01(a) or 9.02 thereafter." (Id.)

Relatedly, Section 11.03, titled "Notices," provides
that "[a]ll notices, requests, claims, demands . . . shall be
in writing . . . and shall be deemed to have been duly given
or made upon receipt[] by delivery in person, [or] by
overnight courier." (Id. § 11.03.)

2.   The MSA

On October 28, 2013, a few days after entering the BTA,
GE and APR Energy executed the MSA, governing any additional
equipment sales between the parties. Among the MSA's terms
was a provision regarding APR's potential resale of turbines
to third parties. In particular, Section 8 of the MSA, titled
"Buyer Resale," provides:

> If Buyer or any of its Affiliates resell any Unit
> purchased by Buyer under this contract (other than to
> Seller or its Affiliates), Buyer shall pay to Seller the
> amounts described in Exhibit B of the Equipment Terms
> and Conditions.

(MSA § 8.)[11] Exhibit B to Attachment D set forth the equipment
terms and conditions as follows:

---

[10] The parties agree that the "Closing Date" was October 28,
2013.
[11] The MSA defines "Seller" as General Electric Company, and
"Buyer" as APR Energy. (MSA at 1.)

**EXHIBIT B TO EQUIPMENT TERMS AND CONDITIONS**

**Resales**

| Elapsed Time after Date of Delivery of Unit by GE to Seller | Amount due back to Seller for Resale By Buyer* |
|---|---|
| <1 year | $2,250,000.00 |
| 1 – 2 years | $1,750,000 |
| 2 -3 years | $1,250,000 |
| 3 – 4 years | $600,000.00 |
| Thereafter | $0.00 |

\* Beginning on January 1, 2015 and on the first day of each calendar year thereafter, amounts to increase by the Annual Inflation Index.

(MSA, Attachment D, Ex. B.) Section 2(c) of Attachment D provides in turn that, if APR were to resell any turbines, it would pay GE the prescribed amount "within thirty (30) Days of such resale of such Unit in cash by wire transfer." (Id., Attachment D § 2(c).)

Section 7 of Attachment D to the MSA outlines the warranty provisions for equipment purchased under the MSA. In particular, subsection (a) provides that GE warranted each New Unit "for the shorter of: (i) eighteen (18) months following the date of Seller's Notice of RTS and (ii) twelve (12) months following the date that fuel is first combusted in such New Unit." (Id., Attachment D § 7(a).) Within that period, the warranty provides that the equipment is "designed and fit for the purpose of generating electric power," and

"free from defects in material, workmanship, manufacture and title." (<u>Id.</u>, Attachment D § 7(b).)

Under subsection (c), APR agreed to notify GE "promptly" in the event of a warranty issue, and "make such Equipment available for correction." (<u>Id.</u>, Attachment D § 7(c).) Section 7(f) of the MSA further provides that the warranty provisions are the "SOLE AND EXCLUSIVE REMEDIES FOR ALL CLAIMS BASED ON FAILURE OF OR DEFECT IN EQUIPMENT." (<u>Id.</u>, Attachment D § 7(f).)

### 3.   APR's Alleged Breach of the MSA

#### i.   The SAPN Opportunity

Pursuant to the Equipment Sale Agreement ("ESA") executed on December 31, 2016, APR purchased fifteen new turbines from GE on December 31, 2016. The parties agreed that the ESA would "supplement the MSA" (GE's Stmt. ¶ 246 (citing the ESA)), and any of the fifteen new turbines that APR resold would be subject to the resale fees set forth in the MSA.

In 2017, SA Power Networks ("SAPN") approached APR about leasing, and possibly purchasing, nine of the fifteen turbines APR had purchased from GE under the ESA (the "SAPN Turbines"). However, SAPN was concerned about APR's ability to fulfill its obligations under a potential agreement, and in June 2017, APR sought GE's assistance in securing the

opportunity. On June 5, 2017, GE sent a letter of support, assuring SAPN that it had confidence in APR's ability to perform under a potential contract and guaranteeing that it would build and operate the plant in the event APR could not.

Initially, APR incorporated in its proposal to SAPN the resale fees it would owe GE for the turbines should SAPN exercise its option to purchase -- and not just lease -- the SAPN Turbines. To make its offer more attractive to SAPN, however, APR asked GE if it would waive the resale fee for the SAPN Turbines. GE agreed.

ii.   The Waiver Letter

On June 19, 2017, GE and APR Energy signed a letter conditionally waiving the resale fee. (See Waiver Letter.) Under Section 2.1 of the Waiver Letter, GE agreed, "subject to" compliance with Section 2.2, to waive the resale fee "solely with respect to the sale by APR of the Subject Units to SAPN." (Id. § 2.1.) Section 2.2 provides in turn that, if SAPN[12] exercised its purchase option, APR would "purchase New Units from GE pursuant to the MSA utilizing sixty-five percent (65%) of any net proceeds APR receives from SAPN in connection with SAPN's purchase." (Id. § 2.2.) This section further

_____

[12] The South Australian Minister for Mineral Resources and Energy ("SAG") was the actual purchasing entity under the agreement. However, for ease, and because the distinction between the entities is immaterial for resolution of the present motions, the Court will distinguish between them only to the extent necessary.

provided that APR would purchase the New Units "within thirty (30) days of the closing of the sale" of turbines to SAPN. (Id.)

A few weeks later, on July 6, 2017, SAPN entered a short-term contract renting the SAPN Turbines from APR. On November 28, 2017, APR and SAPN entered an asset sale contract for the ultimate sale of the SAPN Turbines, and on December 21, 2018, the sale closed. The net proceeds from the sale amounted to approximately $161 million.

### iii.   APR's Debt with Bank of America

In September 2017, before the sale closed, APR's lender, Bank of America, suggested to APR that all the proceeds from the sale of the SAPN Turbines -- should the sale ultimately occur – be applied to APR's outstanding debt to the bank. APR initially pushed back on this suggestion because of the resale fees it owed GE under the Waiver Letter.

Ultimately, APR agreed to Bank of America's suggestion, and on August 7, 2017, SAPN executed a Priority Deed under which amounts payable upon exercise of the purchase option for the SAPN Turbines would be paid directly by SAPN to the bank. (See Byars Decl. Ex. 6 (the "Priority Deed"), Dkt. No. 154-5 § 3.2(b)(i).) The Priority Deed also established that the fees would be paid according to the terms of the loan documents. (Id.)

Later, on October 16, 2017, APR executed Amendment No. 11 to Third Amended and Restated Credit Agreement with Bank of America. (Falk Decl. Ex. 75 (the "APR Credit Agreement"), Dkt. Nos. 138-23--138-26.) Under the APR Credit Agreement, APR agreed to use the "Net Cash Proceeds" to pay down its debt. Notably, the resale fee owed to GE under the MSA was carved out from the definition of Net Cash Proceeds.[13]

The sale of the SAPN Turbines closed on December 21, 2018. At that time, Bank of America exercised its right to collect funds due as a result of the sale. However, APR "inadvertently" did not deduct the resale fee from the Net Cash Proceeds calculation it submitted in connection with its prepayment notices. (GE's Reply Stmt. ¶ 314.) APR submitted an invoice to Bank of America on February 11, 2019, seeking return of the resale fee owed to GE but the bank rejected that invoice on March 11, 2019.

Since December 2016, APR has not purchased any new turbines from GE and APR has not paid the resale fee to GE.

    4.   <u>GE's Alleged Breach of the BTA</u>

        i.   <u>The Forge Turbines</u>

---

[13] The APR Credit Agreement defines the Net Cash Proceeds as the gross cash proceeds from the sale of turbines to SAPN, less payments to GE for amounts due under Section 8 of the MSA. (<u>See</u> APR Credit Agreement at APR0169886.)

13

Included in the Energy Rentals Business was GE's March 5, 2013 rental contract (the "Forge Lease") for four TM2500+ mobile gas turbine generators (the "Forge Turbines") with Australian entity Forge Group Power Pty. Ltd ("Forge"). Schedule B to the Form Contribution Agreement lists the Forge Lease as among the "Business Contracts." As previously noted, though Schedule A to the Form Contribution Agreement does not include the Forge Turbines, Schedule A to the Asset Co Contribution Agreement lists the Forge Turbines as "Equipment Assets."

> ii.   ANZ's Security Interest in the Forge Turbines

On July 2, 2013, a third-party lender -- the Australia and New Zealand Banking Group Limited ("ANZ Bank") -- filed a statement on Australia's Personal Property Securities Register ("PSSR") asserting that it held a security interest in "[a]ll present and after-acquired property" belonging to Forge. (See Falk Decl. Ex. 28, Dkt. No. 136-28, at 1.) ANZ's security interest could attach only at the time Forge took possession of the Forge Turbines.

The parties dispute when exactly Forge took possession of the Forge Turbines. The turbines arrived at the Forge site on October 19, 2013 and November 11, 2013. GE insists that Forge took possession when the Forge Turbines were declared "mechanically complete" shortly thereafter on October 28,

2013 and November 19, 2013. APR contends that Forge took possession earlier, in September 2013, when GE International delivered the turbines to Forge at GE International's Houston facility, as this date marks when the risk of loss passed to Forge. (See GE's Reply Stmt. ¶ 173.)

Around this period, Forge began experiencing financial difficulties and on February 11, 2014, Forge declared insolvency. At that point, neither GE nor APR had filed a security interest in the Forge Turbines on the PSSR, and litigation regarding title to the Forge Turbines ensued.

On October 26, 2015, APR Energy's counsel sent a letter to GE regarding GE's breach of certain provisions, including its agreement under the BTA to maintain "Equipment Assets" -- including, by its account, the Forge Turbines -- free and clear of any liens. (See Byars Decl. Ex. 22 (the "October 2015 Letter"), Dkt. No. 154-15.)

### iii.   The Battle Over Title to the Forge Turbines

APR retained the law firm Baker & McKenzie ("Baker") in September 2013 to conduct due diligence, including with respect to APR's potential purchase of the rental contract governing the Forge Turbines. In April 2014, on Baker's advice, certain APR entities and GE International filed suit in the Middle District of Florida seeking to recover title to the Forge Turbines. A few months later, in July 2014, GE

International and the APR entities entered an "Interim Arrangement Deed" with Forge, dismissing all U.S. proceedings, including the Florida action. Also under the Interim Arrangement Deed, APR posted a $44 million bond to secure the return of the Forge Turbines.

On August 1, 2014, Forge receivers initiated suit against the APR entities and GE International in Australia to resolve the issue of title to the Forge Turbines there. Under a proposed settlement offer, APR could have limited its liability to a maximum of $20 million. However, APR rejected the settlement.

On February 11, 2016, the Australian court ruled in Forge's favor, determining that the APR entities and GE International's security interest vested in Forge immediately before the appointment of the voluntary administrators on February 11, 2014. Despite the ruling, APR continued to pursue legal title to the Forge Turbines by, for example, filing a petition seeking leave to appeal the Australian court's decision and commencing another action in Texas state court. These efforts were unsuccessful: the Australian High Court declined to review the petition and dismissed APR's appeal on June 15, 2017, and the Texas action was dismissed on jurisdictional grounds on February 27, 2017.

By February 2018, Ed Patricoff ("Patricoff"), APR's interim general counsel, contacted GE seeking approval for a potential settlement with Forge. GE consented and a settlement was entered later that month under which APR dismissed all proceedings against Forge. (See Falk Decl. Ex. 62 (the "Deed of Settlement"), Dkt. No. 138-12.) Under the Deed of Settlement, Forge acknowledged that APR (through Asset Co.) had full legal and beneficial title to the Forge Turbines.

The parties agree that the Deed of Settlement does not include a covenant not to sue between APR and GE. Nevertheless, GE contends that, based on representations from Patricoff, GE consented based on its understanding that the proposed settlement would resolve *all* disputes regarding title to the Forge Turbines, including as between APR and GE. APR disputes that such representations were ever made.

### iv.   APR's Malpractice Suit Against Baker

APR filed a malpractice suit against Baker on August 31, 2017 in Florida state court, alleging that "as a direct and proximate cause of Baker's negligence" related to the due diligence it conducted on the Forge Turbines, APR suffered at least $44 million in damages. (GE's Reply Stmt. ¶ 230.) In particular, APR claimed that Baker had failed to advise it regarding ANZ's registered security interest in the Forge

Turbines and the related consequences, including the possibility that ownership of the Forge Turbines would be forfeited if Forge became insolvent. The parties settled the malpractice case in April 2019, for a sum of money paid directly to APR.

### 5.   GE's Alleged Breach of the MSA

Among the fifteen turbines APR purchased from GE in December 2016 under the ESA was the "GT2 Turbine." On February 9, 2018, an APR employee sent an email to GE employees indicating that APR intended to lodge a warranty claim based on the failure of the GT2 Turbine's generator. (See Byars Decl. Ex. 9, Dkt. No. 154-8, at APR0003686.)

In April 2018, APR shipped the generator to a third-party entity, the BRUSH Group, for inspection and repair. After the BRUSH Group inspected and repaired the failed GT2 Turbine generator for $600,000, APR submitted a timely claim to GE for reimbursement on July 17, 2018. GE rejected the claim.

### B.   PROCEDURAL HISTORY

GE filed the Complaint in this action on April 18, 2019, bringing Count One against APR Energy stemming from APR Energy's alleged breach of the MSA's resale provision. (See Dkt. No. 1.) On May 28, 2019, APR filed its Answer & Counterclaims against GE, bringing Counterclaim One against

GE for its alleged breach of Section 3.08 of the BTA, and Counterclaim Two against GE for its alleged breach of the warranty provision of the MSA. (See Dkt. No. 22.) The case proceeded to discovery through the fall of 2019 and all of 2020.

On January 22, 2021, the parties filed a joint letter, indicating that expert discovery was complete and requesting the Court enter a proposed summary judgment briefing schedule. (See Dkt. No. 119.) The Court directed the parties to set forth the grounds for any proposed summary judgment motions via letter. (See Dkt. No. 120.) Consistent with that order, the parties filed letter motions for summary judgment on January 28, 2021 (see Dkt. Nos. 121, 122), and letter oppositions on February 1, 2021 (see Dkt. Nos. 123, 124).

Without leave and before the Court ruled on the pending letter motions, the parties filed briefs consistent with the schedule they had proposed, but which the Court had not approved. Both parties filed opening briefs (see "GE's Br.," Dkt. Nos. 139, 141; "APR's Br.," Dkt. Nos. 127, 133) and supporting materials on February 26, 2021 (see Dkt. Nos. 125 --142). The parties filed opposition briefs (see "GE's Opp'n Br.," Dkt. Nos. 144, 147; "APR's Opp'n Br.," Dkt. Nos. 153, 156) and supporting materials on March 29, 2021 (see Dkt. Nos. 143--157.) They filed reply briefs (see "GE's Reply Br.,"

Dkt. Nos. 167, 170; "APR's Reply Br.," Dkt. Nos. 161, 163)
and supporting materials on April 19, 2021 (see Dkt. Nos.
159--172).

The Court admonishes the parties for their failure to
comply with the Court's Individual Practices by submitting
briefing without leave. Nevertheless, the Court will consider
the full record submitted in connection with the cross-
motions for summary judgment given their breadth and the
significant resources expended in assembling them. The letter
motions the parties filed on January 28, 2021 are therefore
moot and any relief requested therein is hereby denied.

C.   THE PARTIES' ARGUMENTS

On Count One, GE argues that APR breached Section 8 of
the MSA by not paying the resale fee after it resold nine
turbines to SAPN. APR contends that the resale fee was waived
in the Waiver Letter. The Waiver Letter, however, provided
that the resale fee would be waived only if APR used 65% of
the net proceeds of the sale to purchase additional turbines
from GE. GE argues that because APR did not use 65% of the
net proceeds to purchase additional turbines, the resale fee
was due, and in failing to pay that fee, APR breached the
MSA. APR counters that it never received any net proceeds
from the sale because the funds paid in exchange for the
turbines went directly to Bank of America. Because it did not

receive any net proceeds, APR insists that it complied with the Waiver Letter by committing 65% of $0 (i.e., $0) towards the purchase of additional turbines, and therefore it had no obligation to pay the resale fee under the MSA.

With respect to Counterclaim One, APR argues that GE breached Section 3.08 of the BTA by conveying encumbered title to the Forge Turbines. GE makes several arguments to challenge this claim. First, GE argues that the claim is time barred because under the BTA, APR had two years to bring a claim for indemnification and did not bring Counterclaim One until over five years after closing. Second, GE contends that the Forge Turbines are not covered by the warranty in the BTA because they are not "Equipment Assets." Third, GE insists it had good title to the Forge Turbines at the time they were transferred to APR. Fourth, GE argues that APR's conduct bars recovery because (1) APR failed to mitigate damages as required by the BTA; and (2) APR is equitably estopped from bringing the claim because it induced GE to approve a settlement regarding the Forge Turbines on the basis that the settlement would resolve all remaining legal actions, including as between APR and GE.

APR argues that the claim was timely made because APR sent a letter seeking indemnification within the time limit prescribed by the BTA. Second, APR insists that while the

Forge Turbines were not among the initial "Equipment Assets" defined in the BTA, the BTA contemplated revisions to this definition, and the definition was in fact revised to include the Forge Turbines. Third, APR contends that the encumbrance on the Forge Turbines attached before the Forge Turbines were transferred in violation of the BTA. Fourth, APR urges that it did endeavor to mitigate its damages and the doctrine of equitable estoppel is inapplicable.

Also with respect to Counterclaim One, APR seeks a declaratory judgment providing that GE's liability is not capped under the plain terms of the BTA. GE challenges APR's interpretation of the BTA and insists its liability is capped at $2.5 million in APR shares.

Regarding Counterclaim Two, APR argues that GE breached the MSA's warranty provision because the GT2 Turbine was defective. GE does not dispute that the turbine was defective, but instead argues that APR cannot recover on this claim because it failed to make the GT2 Turbine available to GE for inspection and repair as required by the MSA.

## II.  **LEGAL STANDARD**

A.  MOTIONS FOR SUMMARY JUDGMENT

Summary judgment is appropriate if the evidence shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.

R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). In this context, a court's role "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 11 (2d Cir. 1986).

The moving party bears the initial burden of demonstrating the absence of any genuine issues of material fact. See Celotex, 477 U.S. at 323; Gallo v. Prudential Residential Servs., L.P., 22 F.3d 1219, 1223 (2d Cir. 1994). If the moving party satisfies its burden, the nonmoving party must provide specific facts showing that there is a genuine issue for trial in order to survive the motion for summary judgment. See Shannon v. N.Y.C. Transit Auth., 332 F.3d 95, 98-99 (2d Cir. 2003). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

In determining whether the moving party is entitled to judgment as a matter of law, the court must "resolve all ambiguities and draw all justifiable factual inferences in favor of the party against whom summary judgment is sought." Major League Baseball Props., Inc. v. Salvino, Inc.,

542 F.3d 290, 309 (2d Cir. 2008). Though a party opposing summary judgment may not "rely on mere conclusory allegations nor speculation," D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir. 1998), summary judgment is improper if any evidence in the record allows a reasonable inference to be drawn in favor of the opposing party, see Gummo v. Village of Depew, 75 F.3d 98, 107 (2d Cir. 1996).

B.   DECLARATORY JUDGMENT

The Declaratory Judgment Act empowers district courts to issue declaratory judgments in a case of actual controversy within its jurisdiction. See Duane Reade, Inc. v. St. Paul Fire and Marine Ins. Co., 411 F.3d 384, 389 (2d Cir. 2005); see also 18 U.S.C. § 2201. "[T]he question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." Md. Cas. Co. v. Pac. Coal & Oil Co., 312 U.S. 270, 273 (1941). Even when these prerequisites have been satisfied, however, "the district court's exercise of its declaratory judgment authority is discretionary." Cat Tech LLC v. TubeMaster, Inc., 528 F.3d 871, 883 (Fed. Cir. 2008).

III. DISCUSSION

The Court notes the parties' agreement that the BTA and the MSA are governed by the laws of the State of New York. (BTA § 11.11; MSA § 18.) The Court is satisfied in this respect and will apply New York State law to the claims at issue.

In New York, "[t]he fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent." Greenfield v. Philles Recs., Inc., 780 N.E.2d 166, 170 (N.Y. 2002). The parties' intent, in turn, is evidenced by "what they say in their writing." Id. (citation omitted).

"A contract is unambiguous if the language it uses has 'a definite and precise meaning, unattended by danger of misconception in the purport of the [agreement] itself, and concerning which there is no reasonable basis for a difference of opinion.'" Id. at 170–71 (citations omitted). When the terms are unambiguous, the intent is to be determined only by the "the four corners of the instrument, and not from extrinsic evidence.'" RJE Corp. v. Northville Indus. Corp., 329 F.3d 310, 314 (2d Cir. 2003) (quoting De Luca v. De Luca, 751 N.Y.S.2d 766, 766 (App. Div. 2002)). The construction of unambiguous contract terms "presents a question of law to be determined by the court." AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A., 626 F.3d 699, 729 n.15 (2d Cir. 2010)

(citing Town of Harrison v. Nat'l Union Fire Ins. Co., 675 N.E.2d 829, 832 (N.Y. 1996)). And "[w]here the terms of a contract are clear, the court may properly grant summary judgment as a matter of law." Id. (citing Hartford Acc. & Indem. Co. v. Wesolowski, 305 N.E.2d 907, 909 (1973)).

On the other hand, "[a] contract is ambiguous if the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings." AEP Energy, 626 F.3d at 729 n.14 (quoting N.Y.C. Off-Track Betting Corp. v. Safe Factory Outlet, Inc., 809 N.Y.S.2d 70, 73 (App. Div. 2006) (internal quotation marks and citations omitted)). Extrinsic evidence may be used to determine the parties' intent when the terms are ambiguous and their intent cannot be determined by the terms. Greenfield, 780 N.E.2d at 171. However, "[i]f there is ambiguity . . . and determination of the intent of the parties depends on the credibility of extrinsic evidence or on a choice among reasonable inferences to be drawn from extrinsic evidence, then such determination is to be made by the jury." Wesolowski, 305 N.E.2d at 909 (citation omitted). In other words, if there is ambiguity, summary judgment is inappropriate. See Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc., 232 F.3d 153, 157–58 (2d Cir. 2000) ("Summary judgment is

generally proper in a contract dispute only if the language of the contract is wholly unambiguous." (citing Mellon Bank, N.A. v. United Bank Corp. of N.Y., 31 F.3d 113, 115 (2d Cir. 1994)). In rare cases, "the court may resolve ambiguity in contractual language as a matter of law if the evidence presented about the parties' intended meaning [is] so one-sided that no reasonable person could decide the contrary." Id. at 158.

A.   GE'S BREACH OF CONTRACT CLAIM BASED ON THE MSA

GE's motion for summary judgment on Count One is granted because APR neither complied with the terms of the Waiver Letter nor paid the resale fee owed under the MSA. APR's motion for summary judgment on this count is thus denied.

The MSA contemplated that APR might resell turbines it purchased from GE to third parties. (See MSA § 8.) It is undisputed that, under the MSA, if APR ultimately resold any turbines, it would be required to pay GE a resale fee. (Id. ("If Buyer . . . resell[s] any Unit purchased . . . Buyer shall pay to Seller the amounts described in Exhibit B.").)

The parties likewise do not dispute that, under the Waiver Letter, GE conditionally waived the resale fee with respect to the SAPN Turbines. (See Waiver Letter § 2.) Section 2.2 of the Waiver Letter provided that, if SAPN purchased the turbines, APR would in turn purchase new turbines from GE

"utilizing sixty-five percent (65%) of any net proceeds APR receives from SAPN in connection with SAPN's purchase." (Id. § 2.2.) Crucially, the parties agree that APR never paid the resale fee under Section 8 of the MSA, nor did APR use 65% of the proceeds of the sale *to purchase additional turbines from GE*.[14] On this basis, the Court finds that APR breached the MSA.

The parties' remaining disputes are immaterial to the existence of a breach. APR alleges that it never received any "net proceeds" from the SAPN sale because the funds went directly to Bank of America. (See APR's Opp'n Stmt. ¶¶ 408-409, 413.) Likewise, APR alleges that it had no choice in the matter. (Id. ¶ 412.) Unsurprisingly, GE disputes these claims. GE asserts that "APR's own documents show that Bank of America did not receive 'all of the funds' from the sale of the SAPN Turbines," and that some of those documents show that certain funds were paid directly to APR. (GE's Reply Stmt. ¶ 411.) GE further argues that APR did have some control over how the fees from the sale to SAPN were paid.

---

[14] To the extent APR argues that it *did* comply with the Waiver Letter because it used $0 to purchase new turbines (see APR's Br. at 25 ("[APR] did not have to buy new turbines to comply with Section 2.2 (65% of $0 is $0).")), the Court finds this interpretation of the Waiver Letter to be flawed. Furthermore, even applying APR's faulty logic, APR's argument still fails. While APR may have used 65% of $0 to comply with the first part of its obligations under the Waiver Letter, it could not -- and did not -- comply with the second part by using that $0 *to purchase new turbines*.

However, the Court need not resolve these factual disputes because they are immaterial to whether APR breached Section 8 of the MSA.[15] Under the Waiver Letter, GE agreed to waive the resale fee "*subject to*" APR's purchase of new turbines using 65% of the net proceeds from the sale. (Waiver Letter § 2.1 (emphasis added).) In other words, the waiver of the resale fee was contingent upon APR's purchase of new turbines. Absent purchase of new turbines, the resale fee would not be waived.

Whether APR could not purchase new turbines because it never received net proceeds and whether its failure to purchase additional turbines was by choice are both beside the point. The fact remains that APR did not, for whatever reason, use the net proceeds to buy new turbines from GE, and the resale fee was therefore not waived. There is no dispute that the resale fee was never paid. Thus, APR breached Section 8 of the MSA. The Court therefore grants summary judgment in favor of GE on Count One.

B.   <u>APR'S BREACH OF CONTRACT CLAIM BASED ON THE BTA</u>

---

[15] For this reason, the Court will not reconsider its denial of APR's letter motion for leave to file a sur-reply regarding an allegedly "new argument" GE raised on reply. (<u>See</u> Dkt. No. 175 ("In GE's reply, GE improperly raises a new argument: that APR was obligated to purchase new turbines from GE because it received AUD22,680,140.80 from SAPN.").) The issue is immaterial to resolution of the motion, and no further briefing is necessary.

The Court denies GE's motion for summary judgment on Counterclaim One because: (1) whether the claim was timely depends on the interpretation of an ambiguous contract term; (2) issues of material fact exist regarding whether GE had "good title" to the Forge Turbines; (3) the Forge Turbines are not excluded from the definition of "Equipment Assets"; (4) APR did not fail to mitigate damages as a matter of law; and (5) issues of material fact exist with regard to GE's equitable-estoppel defense.[16] At this time, the Court also denies APR's motion for a declaratory judgment regarding the existence of a damages cap, without prejudice to renewal once the issue of liability has been resolved.

    a.   <u>Timeliness</u>

Under the BTA, GE agreed to indemnify APR for "the inaccuracy or breach of any representations or warranties." (BTA § 9.01(a)(1).) This warranty was to "survive in full force and effect until the date that is twenty-four months after the Closing Date." (<u>Id.</u> § 11.01.) The sale closed on October 28, 2013, and thus, twenty-four months after the Closing Date was October 28, 2015.

---

[16] APR withdrew its claim regarding GE's alleged breach of Section 5.01(a) of the BTA. (APR's Opp'n Br. at 11, n.3.) Thus, the Court will not address whether GE's conduct with respect to the Forge Turbines was not in the "ordinary course" as required by the BTA.

APR ultimately brought Counterclaim One, alleging breach of Section 3.08, on May 28, 2019 -- well after the survival period expired.[17] However, on October 26, 2015, two days before expiration of the warranty, APR sent GE a letter demanding indemnification under the BTA for certain breaches, including GE's alleged breach of Section 3.08. (See the October 2015 Letter at GEAPR_00002019.) The letter further purported to reserve APR's right to bring suit regarding the alleged breaches at a later date. (Id. at GEAPR_00002022.)

APR contends that the BTA required that notices of claims -- not the claims themselves -- be made only within the Section 11.01 survival period. However, APR's interpretation is belied by the plain language of the BTA, which provides that the warranties survive until October 28, 2015 and that "no *claims* shall be made for indemnification under Section 9.01(a) or 9.02 thereafter." (BTA § 11.01 (emphasis added).)

Nevertheless, it remains unclear whether the October 2015 Letter was itself a timely made "claim," and if so, whether it encompassed the later filed counterclaim. Section 11.03 provides that "notices, requests, claims . . . shall be deemed to have been duly given or made upon receipt[] by delivery in person . . . or via email." (BTA § 11.03.) Though

---

[17] The parties do not dispute that Counterclaim One is within the statute of limitations for breach-of-contract claims in New York. See N.Y. C.P.L.R. § 213(2).

it references "claims," this section is titled "Notices," and the Court is persuaded by GE's argument that the terms "notice" and "claim" are not the same. See Givati v. Air Techniques, Inc., 960 N.Y.S.2d 196 (App. Div. 2013) ("[A] court should not read a contract so as to render any term, phrase, or provision meaningless or superfluous."). However, the Court is unaware of any provision of the BTA setting forth what precisely constitutes a claim and how "claims" and "notices" are distinct. While the October 2015 Letter uses the term "notice," it also expressly "demands" indemnification just as, presumably, a claim would.

The BTA is therefore ambiguous as to what constitutes a "claim," and the Court cannot determine as a matter of law whether the October 2015 Letter satisfied the BTA's requirements. To the extent GE argues that the October 2015 Letter and the May 28, 2019 Counterclaims were two separate claims, the Court is not persuaded. The basis for each, including the underlying factual allegations and related legal arguments, overlap significantly. Because the BTA is ambiguous, the Court cannot determine at this stage whether the October 2015 Letter was a timely made claim, and summary judgment on this basis is inappropriate.

b.   Section 3.08: Good Title

Under Section 3.08 of the BTA, GE represented that it had "good title to the Equipment Assets, in each case free and clear of all Liens." (BTA § 3.08.) "Liens," in turn, is defined in the BTA as "any mortgage, deed of trust, pledge, hypothecation, security interest, encumbrance, lien or charge of any kind." (Id., Ex. A at GEAPR_00000216.)

The parties do not dispute that on July 2, 2013, one of APR's lenders, ANZ Bank, lodged a financing statement on the PPSR indicating that it had registered a security interest in Forge's property, including the Forge Turbines. Nor do they dispute that "ANZ Bank's security interest in the Forge Turbines could only attach at the time Forge took possession of the Forge Turbines." (GE's Reply Stmt. ¶ 166.)

The parties disagree, however, on when Forge took possession of the Forge Turbines such that the security interest attached. The first two Forge Turbines arrived in Australia on October 19, 2013, and the second two arrived on November 11, 2013. GE argues that Forge took possession of the turbines when they were declared "mechanically complete" on October 28, 2015 and November 19, 2013, respectively. APR argues that possession occurred when Forge's "shipping agent" took possession of the Turbines. (APR's Opp'n Stmt. ¶ 368.) In light of this factual dispute, summary judgment is

inappropriate.[18] To the extent the dispute is a legal one, it cannot be resolved at this stage because determining when the security interest attached "depends on the credibility of extrinsic evidence or on a choice among reasonable inferences to be drawn from extrinsic evidence," which is a determination "to be made by the jury." Wesolowski, 305 N.E.2d at 909.

> c.   "Equipment Assets"

The Court likewise rejects GE's argument that the Forge Turbines are not "Equipment Assets" under the BTA. The interpretation GE proposes is no less strained than APR's proposed interpretation of the Waiver Letter discussed above. E.g., Greenwich Capital Fin. Prod., Inc. v. Negrin, 903 N.Y.S.2d 346, 348 (App. Div. 2010) (explaining that a "contract should not be interpreted to produce a result that is absurd, commercially unreasonable or contrary to the reasonable expectations of the parties" (citations omitted)).

The BTA defines "Equipment Assets" as "the turbines, associated packages, parts and other assets listed on Schedule A to the Form of Contribution, Assignment and Assumption Agreement." (BTA, Exhibit A at GEAPR_00000213.)

---

[18] GE references several documents from other proceedings in which APR made representations that contradict its position here regarding when Forge took possession of the Forge Turbines. (E.g., GE's Reply Stmt. ¶¶ 195, 201.) Rather than provide clarity, however, these contradictory representations only muddy the water further, and thus weigh against granting summary judgment.

While the Forge Turbines are not among those listed, a footnote to Schedule A explains that it is "to be revised upon execution of each Contribution, Assignment and Assumption Agreement to include the applicable Equipment Assets assigned by the applicable Transferor to the applicable Transferee." (BTA, Schedule A at GEAPR_00000255.)

The parties do not dispute that one such agreement, the Asset Co Contribution Agreement, includes the Forge Turbines as Equipment Assets on its Schedule A:

| SCHEDULE A | | |
|---|---|---|
| **EQUIPMENT ASSETS** | | |
| **Australia** | | |
| 10xx | Horizon Forge - AUS | 557-205 |
| 10xx | Horizon Forge - AUS | 557-207 |
| 10xx | Horizon Forge - AUS | 557-209 |
| 10xx | Horizon Forge - AUS | 557-211 |

(Asset Co Contribution Agreement at GEAPR_00001022.) Nor do they dispute that the Forge Lease was one of the "Business Contracts" transferred from GE to APR under the BTA.

GE argues, however, that Schedule A to the Form Contribution Agreement was never amended pursuant to Section 11.09, which provides that "[n]o provision of [the BTA] or any Ancillary Agreement may be amended or modified except by a written instrument signed by all the parties to such agreement." (BTA § 11.09.) The parties do not dispute that

neither GE nor APR signed the Asset Co Contribution Agreement. Thus, GE argues that it "could not constitute an amendment under the BTA because it is not signed by the BTA's contracting parties." (GE's Br. at 17, n.6 (citations omitted).)

This reasoning fails for several reasons. First, the BTA nowhere provides that Schedule A can be revised only upon formal amendment. Rather, the BTA expressly contemplates that Schedule A would "be revised upon execution of each Contribution, Assignment and Assumption Agreement." (BTA, Schedule A at GEAPR_00000255.)[19] Even assuming that by "revised," the BTA intended to use the term "amended" -- an illogical assumption at best -- the Asset Co Contribution Agreement complies with Section 11.09 in that it is "a written instrument signed by all the parties to such agreement." (Id. § 11.09.) In this case, the words "such agreement" mean the Asset Co Contribution Agreement, not the BTA. Whether GE and APR signed the Asset Co Contribution Agreement, therefore, has no impact on its compliance with the BTA's amendment protocol. What matters is that the parties to the Asset Co Contribution Agreement signed it.[20]

---

[19] Nor is the Court persuaded that the absence of the word "will" in this provision undermines this analysis. "To be revised" and "will be revised" do not materially differ.

[20] To the extent GE argues that the BTA *itself* required amendment to include the Forge Turbines, this interpretation is not only

Second, the Asset Co Contribution Agreement provides that GE agreed to transfer the Equipment Assets listed therein "on the terms and subject to the conditions set forth in the [BTA]." (Asset Co Contribution Agreement at GEAPR_00001016.) To conclude that an additional, formal amendment was required to effectuate application of the BTA's warranty would thus be contrary to the terms of both agreements.[21]

### d.   Mitigation of Damages

Nor is the Court persuaded by GE's argument that APR cannot prevail on Counterclaim One because it failed to mitigate its damages. Section 9.05 of the BTA provides that: "Each of the parties agrees to take all reasonable steps to mitigate their respective Losses." (BTA § 9.05.)

GE argues that APR failed to mitigate damages in numerous respects, including, for example, by failing to register its interest in the Forge Turbines on the PPSR and rejecting a favorable settlement offer in the Australian Proceedings.

---

inconsistent with the footnote to Schedule A of the Form Contribution Agreement, but also with the fact that, under the BTA, Contribution, Assignment and Assumption Agreements are "Ancillary Agreements." (BTA, Exhibit A at GEAPR_00000208.) In other words, the Form Contribution Agreement, though an Exhibit to the BTA, was also by definition an Ancillary Agreement. It is at least equally plausible under the BTA that to amend it only signatures from the parties to the Ancillary Agreement were required.

[21] Notably, GE acknowledges that the Forge Lease was transferred under the BTA. This admission further supports the Court's conclusion that the Forge Turbines were among the assets transferred under the BTA because to include the Forge Lease and not the Forge Turbines within the BTA's warranty protections would be inconsistent.

However, even if APR failed in each of the ways GE alleges, APR undeniably engaged in *some* mitigation efforts. APR rejected the settlement offer in the Australian Proceedings precisely because it believed the case could be resolved on more favorable terms. And, APR ultimately did enter a settlement with Forge resolving the U.S. and Australian cases.

Neither the BTA nor common-law mitigation principles require APR to have eliminated damages completely. Rather, "[t]o show mitigation, the injured party must demonstrate only that it took reasonable steps to cut its losses, not that it necessarily did what the defendant would have done or what, in hindsight, would have been most effective in reducing the amount of damages." Nat'l Commc'ns Ass'n, Inc. v. Am. Tel. & Tel. Co., No. 93 Civ. 3707, 2001 WL 99856, at *6 (S.D.N.Y. Feb. 5, 2001); see also BTA § 9.05 (requiring the parties "to take all reasonable steps to mitigate"). The Court is not persuaded that APR's mitigation efforts fell short of what is "reasonable" as a matter of law.

e.   Equitable Estoppel

The doctrine of equitable estoppel does not bar Counterclaim One as a matter of law. "To invoke equitable estoppel, a plaintiff must show that: (1) the defendant made a definite misrepresentation of fact, and had reason to

believe that the plaintiff would rely on it; and (2) the plaintiff reasonably relied on that misrepresentation to his detriment." <u>Ellul v. Congregation of Christian Bros.</u>, 774 F.3d 791, 802 (2d Cir. 2014) (internal quotation marks and citation omitted).

GE argues that it consented to APR's settlement with Forge based on APR's representations that the settlement would resolve all litigation regarding title to the Forge Turbines. Thus, GE insists that APR cannot now "resurrect" the claim after having induced GE's consent by falsely promising the issue was resolved. (GE's Br. at 23.)

However, the parties dispute whether APR's representations regarding the settlement were false or misleading. (<u>Compare</u> GE's Stmt. ¶¶ 222-225, <u>with</u> APR's Opp'n Stmt. ¶ 402.) This factual dispute alone renders summary judgment on GE's equitable estoppel defense inappropriate. <u>Knight</u>, 804 F.2d at 11 (explaining that the court's role on motions for summary judgment "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried").

Furthermore, whether GE acted in reliance on APR's alleged misrepresentation is a "nettlesome" and "fact-intensive" question unsuitable for resolution on the present motions. <u>De Sole v. Knoedler Gallery, LLC</u>, 139 F. Supp. 3d

618, 643 (S.D.N.Y. 2015) ("Reasonable reliance is therefore a question normally reserved for the finder of fact and not usually amenable to summary judgment." (internal quotation marks, brackets, and citations omitted)). Thus, the doctrine of equitable estoppel does not bar Counterclaim One as a matter of law.

>    f.   Whether GE's Liability is Capped

Because the Court considers it premature, APR's motion for a declaratory judgment with respect to the alleged liability cap is denied without prejudice.

Under Section 9.01(b)(ii) of the BTA, "the cumulative indemnification obligation of the Sellers under Section 9.01(a)(i) . . . shall in no event exceed $5,000,000."[22] (BTA § 9.01(b)(ii).) APR argues that this indemnification cap does not apply to GE because "Sellers" is defined in the BTA as GE Rental Asset Holding, Inc., General Electric International, Inc., and General Electric Canada, not "GE Parent."[23] (See BTA at 1.)

While seemingly acknowledging that APR's interpretation of the BTA is technically correct, GE insists that this reading would be illogical because the Sellers are not

---

[22] GE alleges that this $5 million limit was later reduced to $2.5 million under the March 28, 2014 Resolution Agreement. See supra note 9.

[23] The BTA defines "GE Parent" as General Electric Company. See supra note 6.

signatories to the BTA, and the promises in the BTA were made on behalf of GE Parent, and therefore only GE Parent has indemnification obligations under the BTA. Thus, "[a] common sense reading of the provision is to limit the liability of the entity making the representation under Section 9.01(a)(i)," i.e., GE Parent. (GE's Opp'n Br. at 21.) In further support of its interpretation, GE cites several drafts of the parties' term sheet, the prospectus APR issued, and the Resolution Agreement, which APR argues suggest that the parties understood the indemnification cap to apply to GE.

The Court declines to resolve this issue as liability for GE's alleged breach of the BTA has not yet been adjudicated. Because of the case or controversy requirement in motions for declaratory judgment, "a court may not adjudicate 'a difference or dispute of a hypothetical or abstract character' or 'one that is academic or moot.'" Cat Tech LLC v. TubeMaster, Inc., 528 F.3d 871, 879 (Fed. Cir. 2008) (internal citation omitted). Here, until liability has been adjudicated, the issue of damages is not ripe and may ultimately be moot. See, e.g., Transcience Corp. v. Big Time Toys, LLC, 50 F. Supp. 3d 441, 451 n.6 (S.D.N.Y. 2014) (explaining that "any analysis of damages at this stage would be premature" while liability for breach of contract was still

41

pending) (citing <u>Asher Assocs., L.L.C. v. Baker Hughes Oilfield Operations, Inc.</u>, No. 07 Civ. 01379, 2009 WL 1468709, at *2 (D. Colo. May 20, 2009) (denying summary judgment in a case in which the defendant sought an "opinion prohibiting the Plaintiffs from seeking certain damages on their contract claims at trial" because "[t]his is a hypothetical scenario" that may not require adjudication depending on resolution of the issue of liability)).[24]

C.   <u>APR'S BREACH OF WARRANTY CLAIM BASED ON THE MSA</u>

The Court denies both GE's and APR's motions for summary judgment with respect to Counterclaim Two because APR's obligations under the MSA warranty provision are ambiguous.

The parties do not dispute that at least one of the fifteen turbines APR purchased under the ESA, the GT2 Turbine, was defective, in violation of the MSA.[25] (<u>See</u> MSA, Attachment D § 7(b) (warrantying that the Equipment[26] would be "free from defects in material, workmanship, manufacture and title").) The parties also do not dispute that APR made GE aware of the

---

[24] For the same reasons, the Court declines to address whether GE's indemnification obligations are to be paid in APR shares.

[25] Though initially APR alleged that GE breached the MSA warranty with respect to fifteen turbines, it now indicates it "intends to pursue only one breach of warranty claim at trial," that is, with respect to the GT2 Brush generator. (APR's Opp'n Br. at 24.)

[26] The parties do not dispute that the term "Equipment" covers the GT2 Turbine.

failure via email in February 2018. (See Byars Decl. Ex. 9, Dkt. No. 154-8.)

However, the parties disagree as to whether APR complied with the terms of the MSA. Under subsection (c), APR agreed to notify GE "promptly" in the event of a warranty issue, and "make such Equipment available for correction." (MSA, Attachment D § 7(c).)

Resolution of Counterclaim Two turns on the meaning of the phrase "make available." APR argues that "GE had the opportunity to inspect and repair the generator had it chosen to do so" because GE "had staff on site that were integrally involved in the inspection of the GT2 generator and contacting BRUSH for repair." (APR's Opp'n Br. at 25.) In particular, APR states that GE had contracted certain personnel to work at the site where the GT2 Turbine was located. GE's response to these alleged facts is unclear. (See GE's Reply Stmt. ¶¶ 417-419.) Nevertheless, the email history indicates that employees associated with FieldCore had GE email addresses, and these and other GE employees were copied on emails regarding the generator failure. (See Byars Decl. Ex. 9, Dkt. No. 154-8, at APR0003686.) Thus, the Court is persuaded that GE was aware of issues with the GT2 Turbine as early as February 2018. (See id.) GE's argument that APR shipped the generator to the manufacturer for inspection and repair

43

"[w]ithout first alerting GE" is therefore unpersuasive. (See GE's Br. at 25.) GE had been alerted that there was an issue with the GT2 Turbine before the turbine was shipped in April 2018.

However, the issue remains whether GE's awareness of the generator failure was enough to satisfy APR's obligations to "make such Equipment available" under the MSA. Because the MSA's language on this point is ambiguous, exactly what APR was required to do cannot be resolved by interpretation of the contract's four corners. "In such a circumstance, summary judgment is inappropriate." AEP Energy, 626 F.3d at 729 n.14 (citing Wesolowski, 305 N.E.2d at 909)).

## IV.  ORDER

For the reasons discussed above, it is hereby

**ORDERED** that the motion for partial summary judgment filed by defendant and counterclaim plaintiff APR Energy plc and third-party plaintiffs APR Energy Holdings Limited, Power Rental Op Co Australia LLC, and Power Rental Asset Co Two LLC (Dkt. No. 131) is **DENIED** in its entirety; and it is further

**ORDERED** that the motion for summary judgment filed by plaintiff and counterclaim defendant General Electric Company (Dkt. No. 129) is **GRANTED IN PART** and **DENIED IN PART**. Specifically, the motion for summary judgment on Count One is

GRANTED, and the motion is DENIED in all other respects; and it is further

      **ORDERED** that the letter motions for summary judgment (Dkt. Nos. 121 & 122) are **DENIED** as moot; and it is further

      **ORDERED** that within twenty days of the entry of this Order the parties submit a timeline for trial.

**SO ORDERED.**

Dated:    New York, New York
          11 June 2021

                                    Victor Marrero
                                    U.S.D.J.